# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                 CIVIL ACTION  No. 05-71722

                                         HONORABLE ARTHUR J. TARNOW
v.                                UNITED STATES DISTRICT JUDGE

DETROIT MEDICAL CENTER,         MAGISTRATE JUDGE
                                         WALLACE CAPEL

                Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT [D/E # 16]

      The United States seeks the repayment of erroneous social security tax refunds for the years 1999 through 2001 that it reimbursed to the Detroit Medical Center ("DMC"), an organization that operates seven hospitals in the Detroit Metropolitan area.  The DMC has since filed a counterclaim seeking social security tax refunds for the years 1995, 1996, 1997, 2002 and 2003.

      The DMC in conjunction with Wayne State University ("WSU") sponsors a graduate medical education program ("GME") that provides DMC hospitals with resident physicians ("residents") in approximately 70 areas of medicine.  Each resident is required to have graduated from medical school earning a M.D. or D.O. degree.  Prior to joining the residency program at the DMC, residents are required to sign a Residency Agreement that sets forth the duties and responsibilities of each party.  As part of their responsibilities, residents are required to provide

patient care and to regularly attend classes.  Also according to the agreement, the DMC is to provide the residents with stipends.

In 2003, the DMC requested a refund for the entire amount of social security taxes that it paid on its medical resident stipends for the period of 1999 through 2001.  The DMC claimed that its residents fell under the "student exception" of the Internal Revenue Code ("IRC"), § 3121(b)(10), causing them to be exempt from Federal Insurance Contributions Act ("FICA") coverage.  The United States granted the refund requests by crediting DMC's outstanding tax liabilities.  The United States now believes the refunds were given in error and has filed suit seeking their return.

In response, the DMC has filed a counterclaim for the denial of claims for refund for the years 1995, 1996, 1997, 2002 and 2003.  The DMC argues it is entitled to FICA refunds for two reasons.  First, the stipends should be classified as noncompensatory scholarships, which would cause them to be exempt from FICA contributions pursuant to 26 U.S.C. § 117.  Secondly, the DMC contends that each resident in question falls within the student exemption under 26 U.S.C. § 3121(b)(10), which also exempts the stipends from FICA coverage.

The Government argues that the stipends should be considered wages for FICA purposes, not scholarships, since there is a substantial *quid pro quo* that takes place in the form health care services in exchange for the stipend.  In terms of the student exception, the Government contends that the legislative history and case law support their position that the student exception does not apply to medical

residents as a matter of law.

This Court finds that the residents' stipends are wages, not scholarships as defined by § 117, the Treasury Regulations, and case law. The Court also determines that the medical residents, as a matter of law, do not qualify in part or in whole for the statutory student exception. As a result, the Court grants Plaintiff's Motion for Summary Judgment for the reasons stated below.

**Scholarship Exception**

**A.    Income Tax**

FICA taxes are imposed on all "wages" paid or received with respect to employment. 26 U.S.C. § 3121(a) defines "wages" as "all means of remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." Any wages received by individuals with respect to employment are taxed at 6.2 % for Social Security and 1.45% for Medicare.

Internal Revenue Code 26 U.S.C. §117 states:

(a) General rule. Gross income does not include any amount received as a qualified scholarship by an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii).

(b) Qualified scholarship. For purposes of this section--
(1) In general. The term "qualified scholarship" means any amount received by an individual as a scholarship or fellowship grant to the extent the individual establishes that, in accordance with the conditions of the grant, such amount was used for qualified tuition and related expenses.
...

(c) Limitation.
(1) In general. Except as provided in paragraph (2), subsections (a) and (d) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services by the student required as a condition for receiving the qualified scholarship or qualified tuition reduction.

The DMC contends that the stipends given to its medical residents should not be considered "wages," pursuant to 26 U.S.C. § 3121(a), but instead FICA exempt scholarships.

The Sixth Circuit first encountered the question whether monies paid to a medical resident are wages in *St. Luke's Hosp. Assoc. v. United States*. 333 F.2d 157, 160 (6th Cir. 1964). The Sixth Circuit affirmed the district court's holding that sums paid to residents were wages because they were in return for the performance of "very valuable services," *i.e.* patient care. *Id.* at 160.

Soon thereafter, the Supreme Court first interpreted § 117 and what constitutes qualified income tax exempt "scholarships" in *Bingler v. Johnson*. 394 U.S. 741, 742 (1969). Recognizing that Congress "never defined what it meant" by the terms "scholarships" or "fellowships" in the statutes, the Court turned its attention to the Commissioner's contemporaneous constructions of the omitted definitions in the form of the Treas. Reg. § 1.117-3(a-c) and § 1.117-4(c). *Id.* at 749-51. The Court determined the definition of "scholarships" supplied by the regulations comported with the ordinary understanding of the term, "as relatively disinterested, 'no strings' education grants, with no requirement of any substantial

*quid pro quo* from the recipients." *Id*. at 751.  Applying this definition, the Supreme Court ruled that the corporation's payments to its employees through a "Fellowship and Doctoral Program" to write dissertations were taxable "compensation" rather than excludable "scholarships."  *Id*. at 757-58.  According to the Court, the most important factor in deciding that the monies paid were compensation as opposed to scholarship was that the corporation "unquestionably extracted a *quid pro quo*" from the fellows.  *Id.* at 757.

Medical residents and institutions have routinely argued that the residents' salaries should be considered "scholarships" as defined by § 117.  However, federal courts have overwhelmingly determined that the medical residents' salaries were not received as "scholarships" as defined by § 117 and interpreted by *Bingler*. *See generally*, *Parr v. United States*, 469 F.2d 1156, 1159 (5th Cir. 1972) (sympathizing with the district court's lament that "these facts, or facts nearly identical, have been litigated so often that one may wonder whether this is wise or what good it can do" citing numerous cases involving this same argument); *Field v. Commissioner*, 680 F.2d 510, 513 (7th Cir. 1982)(since the substantial *quid pro quo* test was announced in *Bingler*, "the numerous courts that have considered various aspects of this issue have almost uniformly held that payments made to medical residents do not qualify for the § 117 exception"; *Cooney v. United States*, 630 F.2d 438 (6th Cir. 1980); *Meek v. United States*, 608 F.2d 368 (9th Cir. 1979); and *Hembree v. United States*, 464 F.2d 1262 (4th Cir. 1972).

In 1986, Congress amended § 117 to add the limitation provision of § 117(c) to make it impossible for residents to exclude their stipends from the income tax. The Joint Committee on Taxation report noted that:

> [u]nder prior law, controversies arose between the taxpayers and the Internal Revenue Service over whether a particular stipend made in an educational setting constituted a scholarship or compensation for services.  In particular, numerous cases have involved resident physicians... who have sought – often notwithstanding substantial case authority to the contrary – to exclude from income payments received for caring for hospitalized patients.... The limitation on the section 117 exclusion made by the Act... should lessen these problems of complexity, uncertainty of tax treatment, and controversy.

Staff of the Joint Comm. On Taxation, 100th Cong., *General Explanation of the Tax Reform Act of 1986* at 41 (Comm. Print 1987)(*footnote omitted*).

**B.     FICA Tax**

Despite closing the door to physician residents' income tax exclusion argument, the DMC argues that medical resident stipends can still be considered FICA exempt scholarships under § 3121 even though they do not meet the qualified scholarship tax exempt status under § 117.  The language relating to the definition of § 117 and the Treasury Regulations in place at the time of *Bingler* remain the same today.  As a result both sides agree that § 117, the Treasury Regulations and *Bingler* control this Court's decision.  The parties' disagree over how to apply *Bingler* to the facts and circumstances of this case and whether Notice 87-31 permits a medical resident's nonqualified scholarship under § 117 to be exempt from FICA contributions under § 3121.

The DMC argues that this court must follow the reasoning of *Bingler* by conducting a "facts and circumstances" analysis to determine whether the residents' stipends qualify as scholarships as opposed to wages. *See generally, Bingler.* 394 U.S. 741 (1969). In hopes of characterizing the residents' role as one where "the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity" as defined by Treas. Reg. 1.117-4(c)(2), the Defendant paints the picture of a resident's life as one involved in the pursuit of study, as opposed to that of an employee at work. DMC relies upon certain facts to show that the stipends are educational in nature: 1) the institution's primary purpose is to be a teaching institution; 2) the existence of full-time faculty; 3) the absence of any requirement for the residents to remain at the hospital following their residencies; 4) the close supervision of residents by faculty members; and 5) the fact that the medical center does not bill for activities of residents.

In making this argument, the DMC focuses its attention to the first part of the Treas. Reg. § 117-4(c)(2), that the program be educational in nature. Even if true, DMC fails to adequately address the second part of the regulation's requirement, "**and** the amount provided by the grantor for such purpose does not represent compensation or payment for the services" rendered. *Id.*(*emphasis added*). The DMC's claim that the residents' stipends are "scholarships" fails because the residents' stipends are given as a substantial *quid pro quo* for patient

care, as defined by provision of IRC § 117(c), the Treasury Regulations, *St. Luke's Hosp.*, *Bingler*, and its progeny. It is uncontroverted that in order to receive stipends, DMC's residents are contractually required to perform valuable patient care services. This is exactly the sort of *quid pro quo* that the Supreme Court in *Bingler* relied on in making its decision. The stipends are not "relatively disinterested, 'no strings' education grants, with no requirement of any substantial *quid pro quo* from the recipients." *Bingler*, 394 U.S. at 751. The residents' *quid* consists in the form of patient care services that are exchanged for the relatively little *quo* in the form of a stipend. The DMC not only receives the benefit of the residents' valuable services for a small amount, it now asks this Court to exempt it from having to pay the required FICA taxes.

DMC next argues that a "fact and circumstances" analysis should be employed to determine the proportion of a resident's stipend that is for services rendered and the portion that is for scholarship. Defendant relies on IRS notice 87-31 which notes that a stipend may qualify in part for exclusion from FICA even when a grant does not meet the qualified scholarship exemption. The portion that does not represent compensation for services provided by the recipient should be exempt from FICA contributions.

Yet, the residents' stipends are an all or nothing proposition. As a condition to receipt of the stipends, the residents are required to perform patient care services. Thus, the entire stipend does not qualify in whole or in part for exclusion

from FICA because receipt of the stipend depends on a resident's health care services. Moreover, although there is an educational component involved in a residents' situation, it is through their patient care that the educational component is achieved. The DMC's attempt to redefine the word "work," by arguing that the residents do not "work" at all, is not persuasive. If this were the case then any on the job training or apprenticeship, if it were conducted under the supervision of a college or university, may qualify for FICA exemption.

This court also notes, though does not rely upon for its decision, that both legislative history and the wider goals of expansive Social Security Act protection also weigh against DMC's arguments.

DMC's final argument that the true "grantor" of the stipends is the government, not the DMC, is erroneous. The DMC, not the government, signs the checks to the residents for the services they provide.

### B.    The Student Exception

#### 1.    Introduction

The DMC argues that it is also entitled to FICA tax relief based on the interpretation of the Internal Revenue Code's student exception listed at 26 U.S.C. § 3121(b)(10).  Under the tax code, "wages" received by individuals "with respect to employment" are taxed at 6.2% for Social Security and 1.45% for Medicare. IRC § 3101(a) and(b).  Employers, such as the DMC, pay an identical excise tax on those same wages.  IRC § 3111(a) and (b).  The tax code defines employment as

"any service, of whatever nature, performed by an employee for the person employing him."  IRC § 3121(b)(A).  The same statute also lists a number of exceptions to the employment definition for FICA related purposes including the student exception.  The student exception excludes from the definition of employment "services performed in the employ of a school, college or university if such service is performed by a student who is enrolled and is regularly attending classes at such school, college or university."  IRC § 3121(b)(10).

At issue here is whether, the stipends paid to medical residents are "wages" received "with respect to employment" as argued by the Government, or whether the residents services fall under the student exception as argued by the DMC.  The Government argues that as a matter of law, based on the legislative history, statutory history and case law surrounding these particular statutes,  medical residents cannot qualify for the student exception because their stipends are "wages" received with respect to employment for the services they provide to DMC.  The DMC contends that the facts and circumstances surrounding its GME program demonstrate that the medical residents are in fact students enrolled in and regularly attending classes at a school, Wayne State/DMC, thereby qualifying for the IRC §  3121(b)(10) student exception.

### 2.    General Principles

Before addressing the merits of the parties' arguments, it is important to consider general principles of coverage under Social Security as directed by the

Supreme Court and the Sixth Circuit.   According to the Supreme Court, the terms

"employment" and "wages" are to be broadly construed since "the very words,

'any service… performed… for his employer,' with the purpose of the Social

Security Act in mind, import a breadth of coverage."  *Social Security Bd. v.*

*Nierotko*, 327 U.S. 358, 365 (1946).  The Sixth Circuit just recently reiterated this

expansive construction of the term "wages," whose definition includes the term

"employment."  "Both the Supreme Court and this circuit have emphasized the

broad inclusive nature of" the definition wages.  *Appoloni v. United States*, 450

F.3d 185, 190 (6th Cir. 2006).

As the Supreme Court stated in *United States v. Silk*, 331 U.S. 704, 711-712

(1947)(footnotes omitted).

> The very specificity of the exemptions... and the generality of the
> employment definitions indicates that the terms "employment" and
> "employee," are to be construed to accomplish the purposes of the
> legislation. As the federal social security legislation is an attack on
> recognized evils in our national economy, a constricted interpretation
> of the phrasing by the courts would not comport with its purpose.
> Such an interpretation would only make for a continuance, to a
> considerable degree, of the difficulties for which the remedy was
> devised and would invite adroit schemes by some employers and
> employees to avoid the immediate burdens at the expense of the
> benefits sought by the legislation.  These considerations have
> heretofore guided our construction of the Act. *Buckstaff Bath House
> Co. v. McKinley*, 308 U.S. 358; *Social Security Board v. Nierotko,* 327
> U.S. 358.

Another principle of tax law is that the taxpayer bears the burden of establishing a tax exemption. "[E]xemptions from taxation are not to be implied; they must be unambiguously proved." *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988); *see also Adkins v. United States*, 882 F.2d 1078, 1080 (6th Cir. 1989).

### 3.    Case Law

At oral argument, it was learned that there are approximately twelve cases nationally where this exact issue is being litigated.  The bellwether of this litigation is the Eighth Circuit's 1998 opinion in *Minnesota v. Apfel*.  151 F.3d 742 (8th Cir. 1998).  Unlike the cases that have followed, the *Apfel* case involved the interpretation of a contract between the United States Government and the State of Minnesota.  At the moment the state of the legal landscape surrounding this question is as follows: the only Circuit to court to address a variant of the issue has been the Eighth Circuit; at least one other circuit, the 11th Circuit, will soon address the issue; only one district court has sided with the Government's position that medical residents, as a matter of law, cannot qualify for the student exception; and at least four other district court's have issued decisions that have followed the *Apfel* decision's rationale of conducting a case-by-case analysis.

Prior to 1950, state employees were exempt from social security coverage. 151 F.3d at 743-44.  In 1950, Congress adopted 42 U.S.C. § 418 which permitted states and their political subdivisions to participate in Social Security by executing

an agreement with the Commissioner.  *Id*. at 744.  In 1955, Minnesota entered into what is referred to as a § 418 agreement which initially applied to only a few limited coverage groups.  *Id*.  In 1958, the State executed a modification adding "services performed by individuals as employees" of the University of Minnesota 'as an additional coverage group."  *Id*. at 744.  For over thirty years, the University did not withhold FICA taxes from its medical residents' stipends nor did it pay the employer's share of Social Security taxes.  *Id*.

The Social Security Administration ("SSA") determined that medical residents were properly covered by the agreement and issued a formal notice of statutory assessment asserting that the State was liable for unpaid social security contributions based on the residents' stipends.  *Id*.  The State contested the determination maintaining that the agreement was not intended to cover medical residents employed by the state.  *Id*.  After exhausting the administrative appeals, the State filed a civil action in district court seeking a redetermination of the assessment.  *Id*.  The district court granted the State's motion for summary judgment overturning the assessment with alternative holdings.  *Id*. at 744-45.  The government appealed to the Eighth Circuit, which currently is the only Circuit to address this issue.  *Id*. at 745.

Affirming the district court's alternative holdings, the Eighth Circuit agreed that the University's medical residents were not "employees" of the University under the 1958 modification and thereby not subject to the FICA taxes.  *Id*. at 745.

In coming to this conclusion, the Circuit concluded that § 418 agreements are to be interpreted as contracts, as argued by the State, as opposed to being "merely statutory evidence that a state has exercised its statutory option to participate in social security." *Id*. at 746.

The part of the ruling that has created this current wave of litigation concerns the district court's alternative holding. The Eighth Circuit alternatively held that "if medical residents were considered employees under the terms of the 1958 modification, the residents are excluded from coverage under the agreement's student exclusion." *Id*. at 747. In coming to this conclusion, the Eighth Circuit focused on its ruling in *Rockswold v. United States*, 620 F.2d 166 (8th Cir. 1980), which determined that stipends paid to medical residents did not qualify as scholarships or fellowships and therefore were not excludable from the residents' gross income for income tax purposes because they were intended to compensate the residents for services they rendered. *Id*. In contrast to the *Rockswold* case which focused on the nature of the payments, the Eighth Circuit focused "on the nature of the residents' relationship with the University" because 20 C.F.R. § 404.1028(c) provides:

> [w]hether you are a student for purposes of this section depends on your relationship with your employer. If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment.

*Id*. In interpreting the regulation, the Eighth Circuit determined that:

> if the residents' participation in the University's program is primarily educational, the residents should be considered students.  If their purpose is to earn a living, however, they do not fit within the definition of the student exclusion.

*Id*.

Applying this test, the Eighth Circuit determined that

> the primary purpose for the residents' participation in the program is to pursue a course of study rather than to earn a livelihood.  The residents are enrolled in the University, pay tuition, and are registered for approximately fifteen credit hours per semester.  Although they provide patient services while working at the hospital, it does not follow they are enrolled primarily to earn a livelihood.

*Id*. at 748.

Even though *Apfel* concerned the language of a specific contract, the case has been utilized by district courts to examine general  IRC student exception claims because both the contract's language mirrors IRC § 3121(10)(b) and 20 C.F.R. § 404.1028(c) is similar to Treasury Regulation 3121.3121(b)(10)-2(b) & (c).

The Government argues that the Eighth Circuit's holding that medical residents are excluded under the student exception is non-binding *dictum*.  However, as the district court in the *Center for Family Medicine v. United States* points out the "Eighth Circuit's interpretation of 'the student exception' was a binding, alternative holding" which in the Eighth Circuit is not considered *dictum*.  2006 U.S. Dist. LEXIS 76234, 12 (D.S.D. 2006) citing *Brazzell v. United States*,

788 F.2d 1352, 1357 n. 4 (8th Cir. 1986)(stating that a binding, alternative holding is not *dicta*).

Since the ruling in *Apfel*, there have been two distinct approaches that district courts have employed when handling these cases.  A majority of district courts, relying on *Apfel*, have determined that based merely on either the statute's language or the statute's language as interpreted by the Treasury Regulation, GME programs may establish through a facts and circumstances inquiry that their residents qualify for the student exception.  This is the position argued by the DMC.  *United States v. Mayo Found. for Med. Educ. & Research*, 282 F.Supp.2d 997, 999 (D. Minn. 2003); *United States  v. Univ. Hosp., Inc.*, 2006 WL 1173455 (S.D. Ohio July 26, 2006); *Center for Family Medicine v. United States*, 2006 U.S. Dist. LEXIS 76234. 4 (D.S.D. 2006); and *Univ. of Chi. Hosps.  v. United States*, 2006 U.S. Dist. LEXIS 68695 (N.D. Ill. 2006).[1]

_____

[1]In *United States v. Mayo Found. for Med. Educ. & Research*, the Government filed an action to recover past-due FICA taxes from a private medical school for stipends paid to residents. 282 F.Supp.2d 997, 999 (D. Minn. 2003). The GME program, in response, asserted a counterclaim seeking a refund of the FICA taxes it paid with respect to residents' stipends for prior years.  Based on the amendment history, the Government argued that medical residents, as a matter of law, could not fall under the student exception. *Id*. at 1005-6.  Relying on the reasoning in *Apfel*, the district court refused to accept the Government's bright line rule.  *Id*. at 1006-1007.  Instead, the district court relied on the statute as interpreted by the treasury regulation to conclude that a case-by-case examination of the residents' relationship with the school must take place.  *Id*

In *United States  v. Univ. Hosp., Inc*., the Government filed an action against defendant to recover erroneously refunded FICA taxes on stipends paid to medical residents.  2006 WL 1173455 (S.D. Ohio July 26, 2006).  The Government filed a summary judgment motion arguing, *inter alia*, that residents' stipends are ineligible to qualify for the student exception, as a matter of law.  The district court determined that § 3121(b)(10) "is unambiguous in that it does

not categorically make stipends paid to medical residents ineligible for the exception." *Id*. The district court noted that § 3121(b)(10) has two specific requirements that must be met to qualify for the exception but the statute did not "create any specific exclusions which prohibit its application." *Id*. According to the Court, the plain language of § 3121(b)(10)

> remains open for medical residents and hospitals to attempt to establish, on a case-by-case basis, that the service rendered by medical residents is not "employment" within the meaning of FICA.

*Id*. Because it found the plain language of § 3121(b)(10) to be clear, the district court decided not to resort to the legislative history as the Government suggested.

In *Center for Family Medicine v. United States*, the GME program sought the refund of the FICA contributions paid for on resident stipends under the student exception, while the Government sought summary judgment based on its argument that residents do not meet the "student exception" as a matter of law.  2006 U.S. Dist. LEXIS 76234. 4 (D.S.D. 2006). Adopting the rationale of the *Mayo* case, the district court determined that binding precedent in the form of *Apfel* "prohibits such a bright line rule."  *Id*. at 6.

> [T]he law of the Eighth Circuit requires a case-by-case determination of whether a medical resident qualifies for the "student exception," and thus, is exempt from the collection of FICA taxes. Based thereon, the court rejects United States' argument that medical residents are never students as a matter of law. To determine whether plaintiffs' medical residents in fact qualify for the "student exception," a factual inquiry into the relationship between plaintiffs and their medical residents is required.

*Id*. at 13.

In the *Univ. of Chi. Hosps.  v. United States*, the University of Chicago Hospitals sought to recover FICA contributions under the student exception.  2006 U.S. Dist. LEXIS 68695 (N.D. Ill. 2006).  The United States moved for summary judgment based on the legislative history that medical residents are categorically ineligible for the student exception because they earn more than a nominal amount of compensation.  *Id*. at 1.  The district court concluded that the plain language of § 3121(b)(10) was ambiguous as to whether residents could qualify for the student exception and turned to the applicable Treasury Regulation.

> Though the plain language of 3121(b)(10) does not clearly indicate whether medical residents are eligible for the student exclusion, the applicable Treasury Regulation provides guidance on how to make the determination.  Neither the government nor UCH has argued that the Treasury Regulation is unreasonable. For this reason, the Court defers to the Treasury Regulation in the first instance,

The other position, argued by the government and adopted by a the district court in *United States v. Mt. Sinai Med. Center*, relies on the statutory and legislative history of the student exception as well as general principles of tax and Social Security law, as opposed to the merely the statute and Treasury Regulation. 353 F.Supp.2d 1217 (S.D. Fla. 2005)(appeal pending).  According to this approach, medical residents, as a matter of law, do not qualify for the student exception.  *Id*. at 1223-1227.  The district court in *Mt. Sinai* concluded that

> interpreting the student exception to include medical residents would conflict with the clear intent of Congress to reserve the student exception for students working few hours and earning nominal compensation, and with the stated intent of Congress to have young doctors, specifically including interns, covered by social security.  The legislative actions... taken together, reflect a broad plan by Congress to cover medical doctors under the social security system, regardless of whether they are still in training or not.

*Id*. at 1227. The case is currently on appeal at the 11th Circuit where oral arguments are scheduled for December 20, 2006.

### 4.    Statute and Treasury Regulations Ambiguous

The DMC asks this Court to follow the reasoning of the district court for the Southern District of Ohio in the *Univ. Hosp.* case, *supra*, to find that IRC §

---

obviating the need to examine legislative history at this stage to ascertain the meaning of the statute.

*Id.* at 7. Turning its attention to Treas. Reg. § 3121.3121(b)(10)-2(b), the district court determined the Regulation to be unambiguous that the amount of remuneration paid to residents is immaterial.  *Id*. at 9-10.

3121(b)(10) unambiguously permits medical residents to qualify for the student exception. In support, the DMC lists a number of facts and circumstances that it believes demonstrates that its GME program is properly categorized as "school, college, or university," that the medical residents are "students enrolled" in the school, and that these residents "regularly attend classes."[2] It is argued that by examining these facts and circumstances in a light most favorable to it, the DMC residents meet the statutory criteria for the student exception.

However, this Court finds that the language of the student exception, which excludes from employment "service performed in the employ of a school… if such service is performed by a student who is enrolled and is regularly attending classes at such school, college or university," is ambiguous as to whether medical residents may qualify for the student exception. IRC § 3121(b)(10). The statute is unclear

---

[2]The DMC has partnered with Wayne State University (WSU) to create the GME. The residents in the WSU/DMC GME program are considered students enrolled at WSU, enjoying student privileges. WSU faculty decide which medical school graduates will be accepted to the program. All the residents' activities are directed and controlled by WSU. WSU faculty supervise and oversee residents' educational/clinical/research activities, determine rotations, and issue evaluations of residents. Two of the DMC's three missions are to educate physicians and conduct research. The GME program is accredited, similar to other graduate schools. The accrediting body the ACGME requires that GME's provide residents with financial support. The stipends are modest compared to what real doctors make. The students/residents must attend classes, conferences, lectures, reports, and rounds. The residents patient care has a two fold purpose to provide care and to educate. The residents assist the faculty physicians in taking histories, suggesting a plan for testing and treatment, which are subject to approval. The DMC also points to the relatively new development of Government funding of GME programs. As a result, GME programs have become exclusively educational in nature. The Medicare and Medicaid money allow DMC to educate residents. The DMC does not bill for its resident activities. Medicare regulations only allowing billing for a resident services, only if the teaching physician is present for "key portions" of the service or procedure.

in a variety of ways: whether a medical resident may be considered a student; whether a GME program may be classified as a school, college or university; and finally, whether the services provided by medical residents may be considered services performed in the employ of the school, college or university.

This ruling follows the reasoning of the *Univ. of Chi. Hosps.* decision which explicitly found the language of student exception to be ambiguous, "the plain language of section 3121(b)(10) does not clearly indicate whether medical residents are eligible for the student exclusion...". 2006 U.S. Dist. LEXIS 68695, 7. This also comports with how every court, besides the *Univ. Hosp.* court, has ruled on this issue. Each of these courts has looked past the plain language of the statute to either the Treasury Regulations or beyond to analyze the claims, implicitly finding the§ 3121(b)(10) to be ambiguous. *See Apfel*, 151 F.3d at 747 (looked beyond the plain language by relying on the language of regulation 20 C.F.R § 303.1028(c)); *Mayo*, 282 F.Supp.2d at 1006-1007(relied on *Apfel*'s ruling, which relied on treasury regulation); *Mt. Sinai*, 353 F.Supp.2d at 1222-12 (relied on general principles of Social Security law and statutory and legislative histories of § 3121(b)(10)); and *Cen. for Family Med.*, 2006 U.S. Dist. LEXIS 76235, 13 (relied on *Apfel* and *Mayo*, which both relied on the applicable Treasury Regulation); *contra*, *Univ. Hosp*. 2006 WL 1173455 (determining § 3121(b)(10) to be "unambiguous").

Treasury Regulation § 31.3121(b)(10)-2 states in relevant part:

(b) For purposes of this exception, the amount of remuneration for services performed by the employee in the calendar quarter, the type of services performed by the employee, and the place where the services are performed are immaterial. The statutory tests are (1) the character of the organization in the employ of which the services are performed as a school, college, or university, ... and (2) the status of the employee as a student enrolled and regularly attending classes at the school, college, or university by which he is employed or with which his employer is affiliated.

(c) The status of the employee as a student performing the services shall be determined on the basis of the relationship of such employee with the organization for which the services are performed. An employee who performs services in the employ of a school, college, or university, as an incident to and for the purpose of pursuing a course of study at such school, college, or university has the status of a student in the performance of such services....

(d) The term "school, college, or university" within the meaning of this exception is to be taken in its commonly or generally accepted sense.

In *Univ. of Chi. Hosps.*, the district court looked to Treasury Regulation 31.3121(b)(10)-2(b) to determine whether the student exception had a nominal amount requirement.  2006 U.S. Dist. LEXIS 68695, 10.   The Treasury Regulation states:

For purposes of this exception, the amount of remuneration for services performed by the employee in the calendar quarter, the type of services performed by the employee, and the place where the services are performed are immaterial.

The district court determined that Treasury Regulation was unambiguous in that it

did not require the remuneration to be a nominal amount in order to qualify for the student exception. *Id.*

Relying upon the majority opinion in *Johnson City Med. Cen. v. United States* (Batchelder dissenting), the Government argues that the student exception requires that the amount paid to students be a nominal in amount and require a less than full-time amount of work. 999 F.2d 973 (6th Cir. 1993). In *Johnson City*, the majority interpreted a similarly worded student nurse exception to require both a nominal amount requirement and a substantially less than full-time work requirement. *Id.* at 975. Since the student exception has an identical legislative history as the student nurse exception, the Government argues that by logical extension the student exception also has both a nominal amount and a substantially less than full-time work requirement.

However, this Court agrees with the reasoning of the *Univ. of Chi. Hosps.* case that the plain language of the applicable Treasury Regulation unambiguously does not include a nominal compensation requirement. *Johnson City* is inapposite to this case because the Treasury Regulation interpreting the student nurse exception, 26 C.F.R. § 31.3121(b)(13)-1, failed to address whether the amount of remuneration is immaterial since the Regulation used "virtually the same language as the statute," which was found to be ambiguous. *Johnson City*, 999 F.2d at 979 (Batchelder dissenting). As a result, both the Majority and the Dissent looked past the Treasury Regulation to the IRS Revenue Ruling and the legislative history for guidance in interpreting the statute, despite disagreeing as to the result. That is

unlike the present situation here, where the Treasury Regulation unambiguously answers the question left unanswered by the statute, the "amount of remuneration" is "immaterial." § 31.3121(b)(10)-2.

Unlike the Eighth Circuit in *Apfel* and those the district courts that adopted its reasoning, this Court finds that the applicable Treasury Regulation's interpretation of § 3121(b)(10) also fails to directly answer whether medical residents may qualify under student exception. Despite its unambiguousness as to the amount of remuneration, Treas. Reg. § 31.3121(b)(10)-2(d) fails to definitively answer whether a GME program may fall under the commonly or generally accepted meaning of the term "school, college or university." Although GME programs provide a type of education to their residents, they are educational in a way similar to an apprenticeship or a position that involves on the job training. If anything, this Court believes that it is generally accepted that GME programs are not generally considered "schools, colleges or universities," no matter what organization places its name on the program. The DMC, as well as other district courts, refer to GME programs as schools, colleges or universities. However, GME programs are more properly categorized as organizations that happen to be associated with schools, colleges or universities.

Moreover, this Court finds the statute as interpreted by Treas. Reg. § 31.3121(b)(10)-2(c) to be ambiguous in determining whether medical residents may be considered students under the statute based on their relationship to GME programs. Under the Regulation, if "an employee... performs services in the

employ of the organization as incident to and for the purposes of study at such school, college or university has the status of a student." *Id*. The Regulation itself provides little guidance since the Regulation has similar language to the ambiguous statute. This statute as interpreted by this section of the Treas. Reg. is ambiguous as it relates to medical residents since it is unclear whether a medical residents' extensive amount of work involved at the hospitals may be considered "incident to" or "for the purposes of study." It is more likely that a medical resident's study is incident to and for the purposes of work.

Because this Court finds the Treasury Regulations to be ambiguous as to whether a GME program may be considered a school, college or university and whether medical residents may qualify for student status under the exception, a review of the statutory and legislative history is appropriate.

### 4. Statutory and Legislative History

Similar to the district court in *Mt. Sinai*, this Court accepts the Government's interpretation of the history of the Social Security Act and their position that medical residents have traditionally been subject to social security taxation. 353 F.Supp.2d at 1223. The DMC argues that it is improper to the extrinsic evidence since Supreme Court has recently rejected legislative history analysis, stating "as we have repeatedly held, the authoritative statement is statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Services*, 125 S.Ct. 2611, 2626 (2005). However, the Supreme Court stated immediately in the same opinion that "[e]xtrinsic materials have a role in

statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."  *Id.*  In this case, the extrinsic materials including the statutory history are able to shed a reliable light on the statute's ambiguous terms.

Enacted in 1935, the Social Security Act initially did not include a student exception.  In 1939, Congress enacted Amendments to the Social Security Act which in part created the precursor to today's student exception.  The 1939 student exception exempted students and employers from paying social security taxes, but made a distinction between students working for tax exempt organizations and non-tax exempt organizations.

> (10)(A) Service performed in any calendar quarter in the employ of any organization exempt from income tax... if... (iii) such service is performed by a student who is enrolled and regularly attending classes at a school, college, or university.

> (10)(E) Service performed in any calendar quarter in the employ of a school, college, or university, not exempt from income tax under 101, if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university and the remuneration for such service does not exceed $ 45.

54 Stat. 1385, § 1426(b)(10)(A) & (E) of the Internal Revenue Code of 1939.

Distinguishing students from medical interns, Congress also created a separate medical intern exception which exempted from social security taxes, "service performed as an interne in the employ of a hospital by an individual who has completed four years' course in a medical school chartered or approved

pursuant to State law." 53 Stat. 1385, § 1426(b)(13).  The 1939 Amendments did not however create an exception for medical residents, nor were they to be included in the medical intern exception.  The legislative history of the 1939 Amendment in the form of a House Report explained the intern exception covered only an intern, "as distinguished from a resident doctor."  *H.R. Rep. No.* 76-728 at 550-51.

Self-employed workers, including physicians, were also not covered under social security. 54 Stat. 1385, § 1402(c)(5).   Thus, the 1939 Amendments created four distinct categories of either actual or future doctors who were exempt from social security taxes: 1) students working for tax exempt organizations; 2) students working for non-tax exempt organizations and regularly attending classes there whose wages did not exceed $45 per quarter; 3) medical interns working for hospitals after having completed medical school; and 4) self employed physicians.

In 1950, the student exception was consolidated by eliminating the $45 quarterly maximum and the exempt/non-exempt organization distinction.  64 Stat. 477, 497, 531 (1950).  The statute that resulted has identical language as the statute at issue today.  *See* IRC § 1426(b)(11)(B) of Internal Revenue Code of 1950; *see also* IRC § 3121(b)(10).

With the addition of the Medicare and Medicaid programs, Congress made a significant overhaul of the Social Security Act in 1965.  Congress eliminated both the medical intern and self-employed physician exemptions, thereby expanding

social security coverage to include these groups. By eliminating both the medical intern and self employed physician exceptions in 1965, Congress continued to enlarge Social Security's coverage.[3]   This expansive act cannot be seen as also silently shrinking those covered by social security coverage, *i.e.* exempting medical residents under the student exemption.   To exempt medical residents conflicts with Congress' intent to have young doctors covered by social security as shown by the statutory history.   At no time did medical residents qualify for the student exception or any other exception.   The statutory history taken together, reflect a broad plan by Congress to protect through Social Security both actual and future doctors once their undergraduate schooling is complete.   This interpretation also comports with general principles of having a broad social security system, construing "wages" and "employment" broadly, and the legislative history.

Moreover, the statutory construction, the statutory history and the legislative history make clear that students, interns, residents-in-training, and physicians fit under separate categories that are not meant to overlap.   The true meaning of a single section must be read in relation to other revenue acts and the history of the income tax legislation.   *Commissioner v. Engle*, 464 U.S. 206, 223 (1984).   Under the 1939 Amendments, students were considered separate from interns since a separate category was created for each.   Had the student exception covered both

---

[3]In a further move towards universal coverage, Congress also repealed the exclusion for interns and residents-in-training working at federal hospitals that was first enacted in the 1950 amendment to the Social Security Act, which further demonstrates the intent of Congress to categorize separately, medical school students, medical interns, and residents-in-training.

students and medical school interns, the intern exception would have been rendered superfluous.  As discussed above, the legislative history also separates medical residents from medical interns.  *H.R. Rep. No.* 76-728 at 550-51.  Allowing medical residents to now fall under the student exception, as the DMC argues, even though medical interns would not be permitted to fall under the student exception due to the principles of statutory construction would thwart congressional intent.  Students,  medical interns, and a medical residents are distinct categories within the Social Security Act that Congress intended to not overlap.

In 1964, the Sixth Circuit rejected a related argument made by medical residents that they were exempt from social security under the intern exception.  *See St. Luke's Hosp.*, 333 F.2d 157.  In that case, medical residents argued that their role had changed since the 1939 Amendments.  In 1939,  a resident's role was that of a doctor who treated patients.  However, since 1939 their role had become more like the role of an intern who was educated and merely happened to treat patients.  The trial court agreed and held that medical residents fell within the exception.

Understanding that a fundamental change in the role of a resident may have taken place, the Sixth Circuit turned to judicial restraint.

> No doubt these developments lend some weight to the argument for expansion of the intern exception to cover residents-in-training.  It seems clear to us, however, that meeting these changed conditions, if indeed there is a warrant for doing so at all, is the function of the legislation and not that of judicial interpretation.

*Id.* at 164.  The Sixth Circuit reversed the trial court ruling that a medical resident

Page 28 of  30

could qualify for the medical intern exception because the distinction that had existed between residents and interns when the intern exception was created in 1939 was now nonexistent.  In doing so, the Sixth Circuit focused on the fact that Congress had explicitly distinguished medical intern from the medical resident when it singled out only medical interns for exemption from social security tax.  *Id.* at 162-64(relying in part on *H.R.Rep. No.* 76-728 at 55051, *supra* ).

Similar to the Sixth Circuit in *St. Luke's*, this Court finds that the development of GME programs lends "some weight to the argument for the expansion of the student exception to cover residents-in-training."  333 F.2d at 164.  It seems clear to this Court, however, "that meeting these changed conditions, if indeed there is a warrant for doing so at all, is the function of the legislation and not that of judicial interpretation." *Id.*

Alternatively, even if the Treasury Regulation unambiguously permits medical residents to qualify for the student exception, this Court is permitted and required to look towards the extrinsic material for guidance in this case so as not to lead to an inconsistent or absurd result.

> A court should look beyond the language of the statute only when the text is ambiguous or when, although the statute is facially clear, a literal interpretation would lead to internal inconsistencies, an absurd result, or an interpretation inconsistent with the intent of Congress.

*Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir. 1999) citing *United States v. Turkette*, 452 U.S. 576, 580 (1981).  Thus, for the same reasons cited above, this Court finds that permitting medical residents to qualify for the student exception

Page 29 of  30

would lead to just such result that is inconsistent with the intent of Congress.  That is, medical interns would be covered by FICA whereas medical residents would not.

For these reasons, the Plaintiff's Motion is **GRANTED** and a judgment for the Plaintiff shall be entered.

s/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  December 1, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 1, 2006, by electronic and/or ordinary mail.

s/Catherine A. Pickles
Judicial Secretary